## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CENGAGE LEARNING, INC.; MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC; and PEARSON EDUCATION, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>FOLLETT CORPORATION; FOLLETT HIGHER EDUCATION GROUP, INC.; VALORE, INC.; and COLLEGE MARKETPLACE, INC.,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1. COPYRIGHT INFRINGEMENT (17 U.S.C. § 101, *et seq.*)<br>2. TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)<br>3. TRADEMARK COUNTERFEITING (15 U.S.C. § 1114)<br><br>**DEMAND FOR JURY TRIAL** |

This is an action to redress the distribution of unlawful counterfeit copies of educational textbooks published by Plaintiffs Cengage Learning, Inc., McGraw-Hill Global Education Holdings, LLC, and Pearson Education, Inc.  Defendants Follett Corporation, Follett Higher Education Group, Inc., Valore, Inc., and College Marketplace, Inc., persist in engaging in this counterfeiting activity in clear violation of Plaintiffs' rights under federal copyright and trademark law.

Plaintiffs allege, on personal knowledge as to matters relating to themselves, and on information and belief as to all other matters, as follows:

## **INTRODUCTION**

1.     Plaintiffs are leading educational publishers who develop, market, distribute, license, and sell a comprehensive range of traditional and digital educational content and tools to

1

professionals and students on virtually all subjects.  Plaintiffs' publications, which include

physical and digital textbooks, are among the most popular and widely used titles in their fields.

2.      Defendants run a large and sophisticated textbook distribution business.

Defendants understand but do not adequately respect the fact that trafficking in counterfeit

textbooks violates the federal copyright and trademark laws.  Defendants regularly look to

unknown and unverified sources for cheap books in order to maximize their profits, too often

purchasing counterfeits that they turn around and sell or rent to the public.

3.      While Defendants purchase authentic textbooks from Plaintiffs and various

legitimate third-party sellers, Defendants simultaneously source from third-party sellers who are

not reputable and deal in counterfeit goods.  These scurrilous dealers are no better than those

selling counterfeit watches on a street corner.  They often sell online under pseudonyms and

multiple false identities to maintain anonymity.  Moreover, because selling new books at below-

market prices may raise suspicions, these sellers often attempt to mask their illegal conduct by

selling brand new counterfeit books as "used."  Defendants buy from such sellers, even when

Defendants have no idea of the sellers' true identities, where they are located, or whether they

have a history of illegal activity or any credible explanation for what they are selling.

Defendants have long recognized that they often receive counterfeit textbooks when sourcing

from such non-reputable sellers.  Nevertheless, Defendants have continued their practice

unabated, contending that they adequately ferret out many of the counterfeits they receive by

inspecting at least some of the books for authenticity upon receipt.

4.      Unfortunately, it is clear that Defendants' inspection processes are porous and

flawed.  As a result, Defendants' inventory is infected with counterfeits, many of which they

redistribute into the marketplace.  Indeed, Plaintiffs have purchased counterfeit copies of at least

2

46 textbook titles from Defendants through their physical stores and online sites in the last four months alone.  Plaintiffs also have obtained numerous counterfeits from Defendants' customers, who purchased them from Defendants.  But this is a mere snapshot.  The true scope of Defendants' distribution of counterfeits is likely much greater and not precisely known to Plaintiffs, who fear that what they know to date is only the proverbial "tip of the iceberg."

5.      Dating back years, Plaintiffs have attempted to work with Defendants to help them avoid counterfeits.  Along with numerous discussions, Plaintiffs have trained Defendants' employees multiple times on how to avoid buying counterfeits and how to identify counterfeits when they arrive at the warehouse.  Plaintiffs even created a publicly accessible educational website to help Defendants and others avoid counterfeits (http://stopcounterfeitbooks.com). Prior to commencing this action, Plaintiffs also had lengthy and detailed discussions with Defendants concerning the need for them to address their issues with counterfeits.  These discussions were ultimately fruitless.

6.      Notwithstanding their persistent, obvious, and ongoing infringement problem, which cannot be denied, Defendants remain committed to their counterfeit book practices. Defendants refuse to conduct due diligence on their suppliers and fuel the counterfeit market by relying on the process of buying and inspecting counterfeits instead of not buying them in the first instance.  Defendants also seem to misperceive counterfeits to be solely the publishers' problem.  While Defendants claim to cooperate with Plaintiffs on addressing counterfeits, their efforts are at the margins, rather than stamping out the root of the problem.  As shown by their recent activity, Defendants continue to turn a blind eye to their risky practices, choosing instead to put profits over compliance with the laws that prohibit distributing counterfeits.

7.      Sales of counterfeits displace legitimate sales, depriving Plaintiffs and their authors of the much-needed returns from their creative efforts and investments.  Left unchecked, counterfeits threaten the publication of deserving works, depriving students and others of important learning tools.  Moreover, while the quality of the counterfeit books varies, some are of very poor quality.

8.      Accordingly, after repeated pleas to Defendants to clean up their involvement with counterfeits have proven unavailing, Plaintiffs hereby bring this action for injunctive relief and damages to put an end to and remedy Defendants' ongoing infringement.

**JURSIDICTION AND VENUE**

9.      This is a civil action arising under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, and the Lanham Act, 15 U.S.C. §§ 1114 *et seq*.  This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 15 U.S.C. § 1121.

10.      The Court has personal jurisdiction over Defendants.  Defendants regularly and systematically conduct business within and directed to New York, including business transactions and tortious acts that encompass the acts complained of herein.  Defendants have contracted to supply goods, including counterfeit goods, within New York and committed acts of copyright and trademark infringement and counterfeiting within New York, including distributing counterfeit copies of Plaintiffs' works in and from New York.  For example, McGraw Hill Global Education Holdings, LLC recently bought multiple counterfeit copies of one of its textbooks at the LIM College Bookstore located at 216 E. 45th St., New York, NY 10017 – one of approximately sixty stores in the State of New York owned, operated and/or managed by the Follett Corporation and/or Follett Higher Education Group, Inc.  Defendants have further committed acts of copyright and trademark infringement and counterfeiting outside

4

New York, which have caused injury to Plaintiffs in New York, and Defendants expected or reasonably should have expected such acts to have consequences in New York, and derive substantial revenue from interstate or international commerce.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 28 U.S.C. § 1400(a).  Many of the acts specified in paragraph 10 above occurred in and were directed to this District.

## THE PARTIES

12.     Plaintiff Cengage Learning, Inc., formerly Thomson Learning Inc. ("Cengage"), is a Delaware corporation with its principal place of business at 20 Channel Center Street, Boston, Massachusetts 02210.  Cengage also maintains an office in New York, New York.

13.     Plaintiff McGraw-Hill Global Education Holdings, LLC ("MHE") is a Delaware limited liability company with its corporate headquarters at 2 Penn Plaza, New York, New York 10121.

14.     Plaintiff Pearson Education, Inc. ("Pearson"), is a Delaware corporation with its principal place of business at 330 Hudson Street, New York, New York 10013.

15.     Defendant Follett Corporation is an Illinois corporation with its principal place of business at 3 Westbrook Corporate Center, Westchester, Illinois 60154.

16.     Follett Higher Education Group, Inc. (collectively with Follett Corporation, "Follett") is an Illinois corporation with its principal place of business at 3 Westbrook Corporate Center, Westchester, Illinois 60154.  Follett Higher Education Group, Inc. is a wholly owned and/or controlled subsidiary of Follett Corporation.  Follett Higher Education Group, Inc. is registered to business in New York and has a registered agent for service of process in New York.

17.     Defendant Valore, Inc. is a Delaware corporation that maintains offices at 268 Summer Street, Boston, Massachusetts 02210.  Since its acquisition by Follett in November 2016, Valore, Inc. is wholly-owned, operated and/or managed by Follett, and Follett controls, finances, and profits from Valore Inc.'s operations and activities.  Valore, Inc. is registered to do business in New York.

18.     Defendant College Marketplace, Inc. (collectively with Valore, Inc., "Valore") is a Delaware corporation that is affiliated with Valore, Inc. and maintains offices at 268 Summer Street, Boston, Massachusetts 02210.  College Marketplace, Inc. does business under its own name and/or the trade name "ValoreBooks," and operates the website ValoreBooks.com, which sells and ships textbooks to customers, including those in New York.  Since Valore Inc.'s acquisition by Follett in November 2016, College Marketplace, Inc. is also owned, operated and/or managed by Follett, and Follett controls, finances, and/or profits from College Marketplace, Inc.'s operations and activities.

## PLAINTIFFS' BUSINESSES, COPYRIGHTS, AND TRADEMARKS

19.     Plaintiffs are some of the largest and most successful publishers of textbooks and other educational materials in the United States and throughout the world.  With a rich literary and educational heritage, Plaintiffs' products and services are used worldwide at educational institutions and in other learning environments and sold through a variety of direct channels and via a worldwide network of distributors.

20.     Plaintiffs are the copyright owners of, and/or the owners of the exclusive rights under copyright in those works or derivative works described on Exhibit A (hereinafter, "Plaintiffs' Authentic Works"), among others.  Plaintiffs or their affiliates have obtained copyright registrations, duly issued by the United States Copyright Office, protecting their

respective copyrights in Plaintiffs' Authentic Works.

21.     Plaintiffs' Authentic Works bear trademarks and service marks as set forth on
Exhibit B (hereinafter, "Plaintiffs' Marks"), which Plaintiffs or their affiliates have duly
registered on the Principal Register of the United States Patent and Trademark Office.  Plaintiffs
own or are the exclusive licensee of Plaintiffs' Marks.  Plaintiffs' Marks are distinctive and
arbitrary and in some cases are now incontestable under Section 15 of the Lanham Act, 15
U.S.C. § 1065.  All of the registrations listed on Exhibit B are valid, subsisting, unrevoked, and
not cancelled.  Plaintiffs also own common law rights in these and other trademarks.

22.     Plaintiffs have yet to identify the full range of intellectual property that
Defendants have infringed.  Accordingly, Exhibits A and B hereto are representative, not
comprehensive, and will be expanded as discovery proceeds (thereby expanding the scope of
"Plaintiffs' Authentic Works," "Plaintiffs' Marks," and "Counterfeit Textbooks" as defined
below).

23.     Plaintiffs invest heavily in publishing their textbooks.  Each year they incur
substantial costs in conceiving, developing, maintaining, producing and modifying their
textbooks.  Plaintiffs pay author royalties and incur other costs of content creation or licensing,
copyediting and proofreading, typesetting, layout, printing, binding, distribution, promotion, and
for support of their editorial offices.  Plaintiffs also invest substantial time, energy, and resources
into marketing their textbooks around the world.

24.     Plaintiffs and/or their predecessors have invested decades of effort in building a
reputation of quality in the publishing industry, which consumers associate with Plaintiffs and
their respective Plaintiffs' Marks.  Plaintiffs invest significant resources annually in the
worldwide advertisement and promotion of their goods and services under their respective

Plaintiffs' Marks.  Plaintiffs' Marks and the goodwill of the business associated with them in the United States and throughout the world are of tremendous value and have become associated in the public mind with Plaintiffs' reputation for publishing textbooks of the very highest quality.

### DEFENDANTS' UNLAWFUL ACTIVITIES

25.     Beginning on a date unknown, but at least as early as 2014, and continuing to the present, Defendants have distributed counterfeit copies of Plaintiffs' Authentic Works bearing Plaintiffs' Marks (hereinafter "Counterfeit Textbooks").

26.     Defendants have distributed the Counterfeit Textbooks without any authorization or license from Plaintiffs.  Plaintiffs did not print, or authorize the printing of, the Counterfeit Textbooks.

27.     Defendants, also without any authorization or license from Plaintiffs, have used Plaintiffs' Marks in connection with the advertisement, distribution, offer for sale, and/or sale of the Counterfeit Textbooks.  Defendants purport to sell the legitimate and authorized versions of textbooks published by Plaintiffs, but the Counterfeit Textbooks they distribute are not genuine.

28.     Defendants' infringing activities are substantial.  Plaintiffs currently are aware of at least 101 separate titles of Plaintiffs' Authentic Works that Defendants have infringed. Plaintiffs anticipate that additional works and counterfeits thereof will be unearthed in discovery. This current evidence represents only what Plaintiffs recently have discovered through two of Defendants' customers and Plaintiffs' own purchases over a relatively short period of time.

29.     During the last several months alone, Plaintiffs bought many Counterfeit Textbooks from Follett through its websites, online storefronts, and in its bookstores.  Follett claims that it inspects its inventory to ensure it is legitimate.  But the fact that Plaintiffs could buy Counterfeit Textbooks from Follett demonstrates that its processes for inspecting textbooks upon receipt are porous and flawed.

30.     In one stunning example, in May 2017, a representative of MHE walked into the Follett-operated LIM College Bookstore in New York City and found on the shelf twenty copies of its textbook *Elements of Moral Philosophy*.  MHE purchased these textbooks – *all* of which proved to be counterfeit.

31.     Plaintiffs are also aware that Defendants have distributed hundreds of Counterfeit Textbooks to two national book distributors.  These customers of Defendants keep records that allow them to track the suppliers from whom they acquire books, and the customers identified Defendants as the suppliers of these Counterfeit Textbooks.  Plaintiffs inspected the books to determine if they were counterfeit, and they were.  These Counterfeit Textbooks principally were found among the books that the customers had remaining in inventory and that Plaintiffs, therefore, could inspect.  They do not include the many other counterfeits that Defendants likely sold to these customers, but that were no longer in their inventory.

32.     Defendants also do business with numerous other book distributors.  Defendants further distribute books to individual consumers through their network of thousands of physical and virtual bookstores serving educational institutions throughout the United States, along with their multiple websites and online storefronts.  These websites include, without limitation, eFollett.com, bkstr.com, follettbooks.com, follettlearning.com, skyo.com, textbooksnow.com, and valorebooks.com.  Plaintiffs require discovery to learn the scope of the Counterfeit Textbooks that Defendants have distributed through these and other channels.  Given the extensive infringing conduct of which Plaintiffs are already aware, it is highly likely that Defendants distribute counterfeits on a daily and large-scale basis through these channels.

33.     Plaintiffs have repeatedly advised Defendants that their practice of buying textbooks from anonymous and unreliable sources encourages and results in the acquisition of

counterfeits.  Yet Defendants continue to source large quantities of textbooks from faceless Internet sellers, among others.  Defendants do not know the names and locations of such sellers, how the sellers acquired the textbooks they sell, and if they did so legally or illegally. Defendants have indicated that they hope their inspection processes will catch counterfeits before Defendants distribute them.  But Defendants' processes are flawed and insufficient, resulting in Defendants injecting substantial quantities of Counterfeits Textbooks into the marketplace.

34.     Defendants can avoid buying counterfeit copies of Plaintiffs' textbooks by purchasing directly from reliable sources that have acquired authentic copies of Plaintiffs' textbooks, or from Plaintiffs themselves.  For example, in the campus bookstores that Follett operates, Plaintiffs try to work cooperatively with Follett to ensure that students have an adequate supply of authentic textbooks for purchase.  Once a professor adopts one of Plaintiffs' textbooks for use in a course, Plaintiffs typically inform the campus bookstore of the adoption, the number of students enrolled in the course, and the recommended number of textbooks that the bookstore should supply.  In some cases, Follett chooses not to buy from Plaintiffs (or other reliable sources) a sufficient supply of textbooks to meet the needs of the students in the course. Plaintiffs may make the adopted textbooks available for direct purchase through a website link that is accessible by the student or make a direct purchase option available.  In these scenarios, or when Follett purchases from Plaintiffs or other reliable sources who acquired Plaintiffs' authentic textbooks directly or indirectly from Plaintiffs, students purchase authentic copies of Plaintiffs' textbooks, rather than the counterfeit copies that all too frequently appear when Defendants deal with unreliable sources.

35.     In but one recent example of their risky business practices, Follett purchased textbooks from a book distributor located in India that is known to be at the center of an

international counterfeiting ring – shipping tens of thousands of counterfeit textbooks into the United States – and with whom Follett presumably would not have done business if it had exercised reasonable due diligence as to the identity of its supplier.

36.     Defendants also obtain counterfeits through their "buyback" systems.  The principal purpose of these buyback systems is to allow students to sell back their textbooks after they are finished using them.  Accordingly, Defendants purportedly limit the number of textbooks that they will buy through the system from any individual seller.  Counterfeit sellers can evade these limitations, however, by creating multiple accounts using fictitious names and/or addresses.  A basic verification process and/or other technical tools could easily detect and prevent much of the laundering of counterfeits by unscrupulous sellers through Defendants' buyback systems.  But Defendants do not take those simple verification steps.  Nor do Defendants have sufficient controls in place, if any, to identify when the "used" books they buy through the system arrive as new counterfeits.  In essence, Defendants do not take basic steps necessary to root out counterfeits.

37.     As Defendants have increased their purchasing of textbooks from unreliable and unverified third-party sources that provide counterfeits, they have decreased their purchasing from Plaintiffs.  Although Defendants purchase some textbooks from Plaintiffs, in order to ensure they have enough inventory on hand to meet demand, they simultaneously attempt to source from the channels described above that too often yield counterfeits, and then return any unneeded textbooks to Plaintiffs for credit.  To make matters even worse, Defendants from time to time attempt to "return" textbooks to Plaintiffs for credit that are not the authentic books provided by Plaintiffs but rather are the counterfeit textbooks that Defendants purchased from third-parties.

38.     Defendants' recordkeeping practices also serve to increase the likelihood that they will distribute counterfeits into the marketplace.  For instance, Follett's inventory management system retains data only temporarily.  As such, when Follett identifies a counterfeit textbook in its inventory or Plaintiffs purchase a counterfeit textbook from Follett, too often it cannot trace the book back to identify the supplier.  By intentionally limiting the record retention period for its inventory management system, Follett essentially blinds itself from being able to identify those suppliers that have sold Follett counterfeit books.  Plaintiffs have raised concerns about this issue with Follett for a number of years, but Follett has refused to alter its practice, thereby shielding its counterfeit sources from detection.

39.     Follett's practices also shield its counterfeit sources by commingling its inventory in such a way that it can be difficult or impossible to identify the supplier of a particular book.  As a consequence, when Follett surrenders textbooks to Plaintiffs that Follett believes are or may be counterfeit, which it does from time to time, Follett often is unable to indicate the source of the counterfeit books, either initially or once Plaintiffs have confirmed they are counterfeit.  Moreover, when conducting surrenders, Follett often provides surrenders that both misstate the textbooks being surrendered and the quantity of those books.  These surrenders are both ineffective and wholly inadequate to address Follett's issues with counterfeits.

40.     When Defendants cannot trace their inventory back to the source, whether to review items for authenticity or to know which sellers require more careful scrutiny or avoidance altogether, it fuels the counterfeiting problem.  Likewise, such conduct results in Plaintiffs too often not receiving critical information they need to support their efforts to stop suppliers of counterfeit books.

41.     Based on the above-described actions, Defendants' distribution of Counterfeit

Textbooks is knowing and willful.  Defendants have acted recklessly by disregarding the high probability that their conduct will result in the infringement of Plaintiffs' copyright and trademark rights.  Despite repeated warnings that their practices facilitate and lead to the distribution of counterfeits into the marketplace, in violation of Plaintiffs' rights, Defendants have made the deliberate decision to continue these practices.  Defendants know or should know that they are purchasing and then distributing Counterfeit Textbooks.

42.     Plaintiffs suffer serious financial and reputational injury when their copyrights and trademarks are infringed.  A substantial decline in revenue from sales or rentals of Plaintiffs' Authentic Works could cause Plaintiffs to cease publication of one or more deserving textbooks, as but one consequence of the financial damages Plaintiffs are enduring as a result of Defendants' conduct.  This would have an adverse impact on the creation of new textbooks and scholastic endeavor.  Moreover, the busiest textbook selling season is the new school year, which will begin in August.  During this time, in particular, Plaintiffs expect to experience an acute downturn in sales when Plaintiffs' Authentic Works are displaced in the marketplace by the Counterfeit Textbooks.

43.     The Counterfeits Textbooks sold by Defendants have different and sometimes inferior binding, glue, paper, color, and/or printing quality.  Despite the differences, based on the illegal use of Plaintiffs' Marks, certain actual and prospective purchasers are likely to believe that the Counterfeit Textbooks are Plaintiffs' Authentic Works.  This weakens, blurs, and tarnishes Plaintiffs' Marks.

## FIRST CLAIM FOR RELIEF

### Copyright Infringement Under 17 U.S.C. §§ 101, *et seq.*

44.     Plaintiffs re-allege and incorporate by reference the allegations set forth above in

paragraphs 1-43.

45.     Plaintiffs' Authentic Works constitute original works and copyrightable subject matter pursuant to the Copyright Act, and they are protected by registrations duly issued to Plaintiffs (or their predecessors or affiliates) by the United States Copyright Office.

46.     At all relevant times, Plaintiffs have been and still are the owners, or exclusive licensees, of all rights, title, and interest in and to their respective copyrights in Plaintiffs' Authentic Works, which have never been assigned, licensed, or otherwise transferred to Defendants.

47.     Defendants, with knowledge of Plaintiffs' copyrights in Plaintiffs' Authentic Works, infringed Plaintiffs' copyrights.  Specifically, Defendants infringed Plaintiffs' exclusive rights to import their copyrighted works and distribute them to the public by sale or other transfer of ownership.  Defendants did so by, among other things, distributing the Counterfeit Textbooks for profit, without Plaintiffs' permission, license, or consent, in violation of 17 U.S.C. § 106.

48.     Defendants' unlawful conduct, as set forth above, was willful.  Defendants had actual and/or constructive knowledge that their conduct was unlawful and in violation of Plaintiffs' intellectual property rights.  Defendants acted intentionally and in reckless disregard of Plaintiffs' copyright rights.

49.     As a result of Defendants' unlawful conduct as set forth above, Plaintiffs have been, and will continue to be, damaged.

50.     Defendants' actions described above, which are ongoing, have caused and will continue to cause irreparable damage to Plaintiffs, for which Plaintiffs have no remedy at law. Unless this Court restrains Defendants from continuing their infringement of Plaintiffs' copyrights, these injuries will continue to occur in the future.  Plaintiffs are accordingly entitled

to injunctive relief restraining Defendants from further infringement.

## SECOND CLAIM FOR RELIEF

### Infringement of Federally-Registered Trademarks Under 15 U.S.C. § 1114

51.     Plaintiffs re-allege and incorporate by reference the allegations set forth above in paragraphs 1-43.

52.     This claim, arising under Section 32 of the Lanham Act, 15 U.S.C. § 1114, is for infringement of Plaintiffs' Marks.  At all relevant times, Plaintiffs have been and still are the owners, or exclusive licensees, of all rights, title, and interest in and to their respective Plaintiffs' Marks, which are valid and protectable trademarks and service marks that are registered with the United States Patent and Trademark Office.

53.     By their actions described above, Defendants are infringing Plaintiffs' Marks through their use in commerce, without Plaintiffs' consent, of reproductions, counterfeits, copies, and/or colorable imitations of Plaintiffs' Marks, in connection with the sale, offering for sale, distribution, and/or advertising of the Counterfeit Textbooks.

54.     Defendants' aforesaid uses of Plaintiffs' Marks have caused and are likely to continue to cause confusion, mistake, and/or deception as to the source or origin of Defendants' goods, which are of different or inferior quality to Plaintiffs' Authentic Works.  The public, and others, are likely to believe that Defendants' goods are provided by, sponsored by, approved by, licensed by, affiliated with, or in some other way legitimately connected with Plaintiffs, which is untrue.

55.     Defendants have acted intentionally and in reckless disregard of Plaintiffs' trademark rights.  Defendants are intentionally using Plaintiffs' Marks on unauthorized products and infringing upon Plaintiffs' trademark rights in order to further their own business enterprises.

56.     Defendants' unlawful conduct, as set forth above, was willful.  Defendants had actual and/or constructive knowledge that their conduct was unlawful and would cause confusion, mistake, or deception.

57.     As a result of Defendants' unlawful conduct as set forth above, Plaintiffs have been, and will continue to be, damaged.

58.     Defendants' actions described above, which are ongoing, have caused and will continue to cause irreparable damage to Plaintiffs, including to their reputation and goodwill, for which Plaintiffs have no remedy at law.  Unless this Court restrains Defendants from continuing their infringement of Plaintiffs' Marks, these injuries will continue to occur in the future. Plaintiffs are accordingly entitled to injunctive relief restraining Defendants from further infringement.

**THIRD CLAIM FOR RELIEF**

**Trademark Counterfeiting Under 15 U.S.C. § 1114(1)(a)**

59.     Plaintiffs re-allege and incorporate by reference the allegations set forth above in paragraphs 1-43.

60.     This claim, arising under Section 32 of the Lanham Act, 15 U.S.C. § 1114, is for counterfeiting of Plaintiffs' Marks.  At all relevant times, Plaintiffs have been and still are the owners, or exclusive licensees, of all rights, title, and interest in and to their respective Plaintiffs' Marks, which are valid and protectable trademarks and service marks that are registered with the United States Patent and Trademark Office.

61.     By their actions described above, Defendants are infringing Plaintiffs' Marks through their use in commerce, without Plaintiffs' consent, of counterfeits of Plaintiffs' Marks, in connection with the sale, offering for sale, distribution, and/or advertising of the Counterfeit

16

Textbooks, and such use is likely to cause confusion, mistake, and/or deceive the public.

62.     The spurious, counterfeit marks on the Counterfeit Textbooks that Defendants have distributed are identical to and/or substantially indistinguishable from Plaintiffs' Marks that appear on Plaintiffs' Authentic Works.

63.     Defendants have acted intentionally and in reckless disregard of Plaintiffs' trademark rights.  Defendants are intentionally using Plaintiffs' Marks on unauthorized products and infringing upon Plaintiffs' trademark rights in order to further their own business enterprises.

64.     Defendants' unlawful conduct, as set forth above, was willful.  Defendants had actual and/or constructive knowledge that their conduct was unlawful and would cause confusion, mistake, or deception.

65.     As a result of Defendants' unlawful conduct as set forth above, Plaintiffs have been, and will continue to be, damaged.

66.     Defendants' actions described above, which are ongoing, have caused and will continue to cause irreparable injury to Plaintiffs, including to their reputation and goodwill, for which Plaintiffs have no adequate remedy at law.  Unless this Court restrains Defendants from continuing their counterfeiting activities, these injuries will continue to occur in the future. Plaintiffs are accordingly entitled to injunctive relief restraining Defendants from further counterfeiting.

## **PRAYER FOR RELIEF**

By reason of the facts and circumstances alleged above, Plaintiffs seek relief from this Court as follows:

1.     Judgment on each of the claims set forth above;

2.      An accounting and disgorgement of Defendants' profits, gains, and advantages realized from their unlawful conduct, including a reconciliation of purchases and sales of the Counterfeit Textbooks;

3.      An order requiring Defendants to pay Plaintiffs damages as a consequence of Defendants' unlawful acts of copyright infringement as alleged above, including actual damages or statutory damages, at Plaintiffs' election, pursuant to 17 U.S.C. § 504;

4.      An order enjoining Defendants from further infringing upon Plaintiffs' respective copyrights, pursuant to 17 U.S.C. § 502;

5.      An order enjoining Defendants from further counterfeiting and otherwise infringing upon Plaintiffs' respective trademarks, pursuant to 15 U.S.C. § 1116;

6.      An order requiring Defendants to pay Plaintiffs damages as a consequence of Defendants' unlawful acts of trademark counterfeiting and infringement as alleged above, including statutory damages or treble damages and all profits that Defendants have derived in connection with such counterfeiting and infringement, pursuant to 15 U.S.C. § 1117;

7.      An order requiring Defendants to deliver up for destruction all products, packaging, labels, literature, advertising, and other material bearing imitations or reproductions, including confusingly similar variations, of Plaintiffs' respective copyrights and trademarks, pursuant to 17 U.S.C. § 503 and 15 U.S.C. § 1118;

8.      An order requiring Defendants to pay Plaintiffs' attorneys' fees, expenses, and costs of suit, pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

9.      Pre-judgment and post-judgment interest at the applicable rate; and

10.     Such other and further relief the Court deems proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues that are so triable.

DATED: June 21, 2017

Respectfully submitted,

By: _____
Matthew J. Oppenheim
Julie C. Chen
OPPENHEIM + ZEBRAK, LLP
5225 Wisconsin Avenue NW, Suite 503
Washington, DC 20015
Tel: (202) 450-3958
Fax: (866) 766-1678
matt@oandzlaw.com
julie@oandzlaw.com

*Attorneys for Plaintiffs Cengage Learning, Inc., McGraw-Hill Global Education Holdings, LLC, and Pearson Education, Inc.*

19